**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

KELLY W.,                                     :
    Plaintiff,                           :          CIVIL CASE NO.
                                         :          3:20-CV-00948 (JCH)
v.                                            :
                                         :
KILOLO KIJAKAZI, COMMISSIONER                 :
OF SOCIAL SECURITY,                           :          SEPTEMBER 17, 2021
    Defendant.                           :


**RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER (DOC. NO. 19) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISIONER (DOC. NO. 23)**


**I.     INTRODUCTION**

Plaintiff Kelly W. ("Kelly") brings this action under section 405(g) of title 42 of the

United States Code, appealing the Final Decision of the Commissioner of the Social

Security Administration ("Commissioner") denying her application for Disability Income

Benefits ("DIB") and Supplemental Security Income ("SSI") benefits.  See Compl. (Doc.

No. 1).[1]  She moves to reverse the Decision of the Commissioner. Mot. for Order (Doc.

---

[1] Kelly applied for and the Commissioner denied both DIB and Supplemental Security Income ("SSI") benefits.  See AR at 579, 586, AR at 28.  In denying Kelly's claims, the Commissioner found her "not disabled" under the relevant statutes governing both DIB and SSI benefits, properly applying the same analysis to reach his determination for both.  AR at 28; see also Brown v. Colvin, No. 16-CV-03193 (ALC), 2017 WL 3822891, at *7 n. 4 (S.D.N.Y. Aug. 31, 2017) ("The five-step analysis is the same for disability determinations for DIB and SSI claimants.").  However, in Kelly's Complaint, she checked a box indicating that she brings this action to review the Commissioner's Decision under Title II of the Social Security Act, for claims relating to a period of disability and disability insurance benefits. She failed to check boxes indicating that she was seeking review of the Commissioner's Decision under (1) Title XVI of the Social Security Act for claims relating to supplemental security income or (2) under both Title II and Title XVI.  See Compl. at 1.

Having pointed out this issue, the court treats it as a scrivener's error which resulted in neither substantive error in the plaintiff's briefing nor prejudice to the Commissioner.  In their memoranda, both parties' arguments address the Commissioner's decisions with respect to both DIB and SSI. See Pl.'s Mem. at 1 (improperly citing to "42 USC §§ 205(g) and 1632(c)(3) of the Social Security Act, as amended" but seeking review under sections 205(g) and 1632(c)(3) of the Social Security Act, which permit judicial

No. 19); Mem. of Law in Supp. of Mot. to Reverse the Decision of the Comm'r (Doc. No. 19-2) ("Pl.'s Mem.").  The Commissioner cross-moves for an order affirming his Decision.  Mot. for Order (Doc. No. 23); Def.'s Mem. of Law in Supp. of her Mot. for an Order Affirming the Comm'r's Decision (Doc. No. 23-1) ("Def.'s Mem.").

For the reasons discussed below, the court vacates the Administrative Law Judge's Decision with regards to Kelly's eligibility for disability insurance benefits and remands for further proceedings.

## II.    BACKGROUND

### A.    Factual Background

Kelly is a 46-year-old woman who worked as a Certified Nursing Assistant in several nursing homes and home healthcare programs and as a unit coordinator at Nacogdoches County Hospital. Administrative Record ("AR") (Doc. No. 14) at 8, 47-48, 655.  Due to various interrelated health issues, she stopped working in 2014. AR at 47.

#### 1.    Hip and Back Conditions

Kelly's medical records show a history of back and hip pain and impairment. In March 2014, she complained of a history of low back pain to Dr. Mark Cline, who ordered diagnostic testing. AR at 847-57.  Later that year, Kelly was admitted to the emergency room at Nacogdoches Medical Center, where CT scans revealed signs of a mild to moderate degenerative disc disease, AR at 1064-65, for which Dr. Cline referred her for an MRI. AR at 1062-68, 1088.  The MRI, taken on December 5, 2014, revealed

---

review of ripe DIB and SSI claims, respectively); Def.'s Mem. at 1 (noting that Kelly seeks reversal of the Commissioner's Decision with regards to both DIB and SSI benefits under Titles II and XVI of the Social Security Act).  Therefore, the court will treat the pleadings as amended to address Kelly's claims under Title XVI as well as Title II.

degenerative disc disease from L4 to S1, causing radiating low back pain. AR at 1074-75.  Dr. Cline prescribed medication and referred Kelly to physical therapy, where an initial evaluation found that Kelly suffered from tenderness and spasms on palpitation in her lumbar spine.  AR at 1071-72.  At a follow-up visit with Dr. Cline in April 2015, Kelly noted that she was experiencing numbness in her hands and feet, as well as lower back pain.  AR at 1121.

Around six months later, on October 24, 2015, Kelly again found herself in the Nacogdoches Emergency Room after a fall that left her with pain in her left hip and leg. AR at 1255.  While X-rays of her left hip did not show a fracture, they did yield findings consistent with left femoral head avascular necrosis and capsular collapse, with associated moderate degenerative joint disease of the left hip.  AR at 1257.  In the same visit, a lumbar X-ray also showed mild to moderate degenerative disc disease at L4 through S1 and mild facet joint degenerative hypertrophic changes, or swelling of the joint.  AR at 1258.

In 2017, Kelly moved from Texas to Connecticut.  Pl.'s Statement of Facts at 31; AR at 45.  She began seeing her new primary care provider, Alan Dierman, FNP, at Generations Family Health Center on June 26, 2017.  AR at 1487-90.  During Kelly's initial visit, Mr. Dierman diagnosed her with major depressive disorder and Crohn's disease.  AR at 1489.  At a follow up visit on July 20, 2017, Kelly reported back pain from 7 to 10 out of 10, as well as heaviness in her left foot.  AR at 1483.  Her discomfort continued during an exam eight days later, when Kelly reported 9 to 10 out of 10 hip pain as well as back pain and the feeling that she was "walking on pins and needles." AR at 1479.  Mr. Dierman referred her to an orthopedic care provider.  AR at 1481.

On July 19, 2017, Kelly sought care for her left hip and low back pain at Orthopedic Partners, where a physician's assistant noted that she was in "mild distress" and walking "with a significant limp."  AR at 1464-65.  A physical exam showed that Kelly was suffering a "significantly diminished range of motion" and groin pain.  AR at 1465.  Subsequently, X-rays showed "significant degenerative changes" in the left hip, which was "practically bone-on-bone."  Id.  For further evaluation, she was referred to Dr. Stanat, Orthopedic Partners' hip specialist.  Id.  Dr. Stanat saw Kelly on August 11, 2017, when he ordered X-rays that showed, consistent with prior scans, "severe bone-on-bone hip degenerative disease, joint space narrowing, sclerosis, and osteophyte formation with notable acetabular femoral head cyst formation."  AR at 1467.  He recommended surgery—a total left hip arthroplasty—but Kelly had to treat a dental infection and resolve GI issues before she could undergo the operation.  AR at 1467, 1550.

Records from Kelly's November 28, 2017 visit with Dr. Stanat show that she was still experiencing pain and reduced mobility, AR at 1550, and on December 8, 2017, she received a steroid injection in her left hip to mitigate the discomfort.  AR at 1549.  On the day of the injection, Kelly reported "excellent relief of pain", id., but later records show limited lasting benefit from the injection.  AR at 1542.  She also reported that the cortisone injection had a "moderate effect" and complained of continued pain in her left hip when she visited her primary care provider, Mr. Dierman, in December 2017.  AR at

1529-31.  Kelly's pain spread to her left groin during a January 2018 follow-up appointment with Dr. Stanat.  AR at 1547.[2]

After the injections, Kelly underwent a total left hip replacement on March 28, 2018.  AR at 1532-36.  She was discharged from the hospital the following day but received home nursing care and physical therapy services through May of the same year.  AR at 1580-1685.

Kelly's post-surgery recovery showed mix signs of progress.  At an April 13, 2018 post-operative visit with Orthopedic Partners, she reported significant swelling in her left leg but showed a "full and nonirritable left hip range of motion."  AR at 1662.  Ten days later, she complained of swelling in both legs to Mr. Dierman.  AR at 1676.  She continued to experience pain and limited mobility during her last follow up visit to Orthopedic Partners on May 8, 2018, when she reported difficulty with "walking, squatting, lifting, car transfers, negotiating stairs, sit to stand transfers, bed mobility and sleeping."  AR at 1659.  During that appointment, she reported that her pain with activity was a 5 out of 10, and her resting pain was a 2 out of 10. Id.  A physical exam revealed pain outside of a limited range of motion.  AR at 1659-60.  To address her symptoms, Dr. Stanat recommended physical therapy.  AR at 1660.  Subsequently, during a May 29 post-operative appointment, Dr. Stanat noted that she was "doing well" and "walking with a walking stick."  AR at 1688.

From June 5 to June 26, 2018, Kelly attended six outpatient physical therapy sessions to aid her recovery.  AR at 1717-31.  Records from her physical therapy

---

[2] Notes from Kelly's final May 8 appointment with Orthopedic Partners after surgery also indicate that cortisone injections led to "no relief in symptoms."  AR at 1659.

sessions show that she struggled with pain and tenderness in her lateral hip, back pain, balance impairment with an abnormal gait, and limited left hip range of motion.  AR at 1720.  At the same time, she noted that her current pain at the time of each appointment was a 2 to 3 out of 10.  AR at 1717, 1723, 1725, 1726, 1729, 1730.  While she indicated low current pain levels at each appointment, twice she noted that her pain was "at worst" an 8 out of 10, AR at 1717, 1725, and three times she stated that her pain was "at best" a 0 out of 10.  AR at 1717, 1723, 1726.

> 2.    Gastrointestinal Issues

In August 2013, a colon exam revealed that Kelly showed signs of "active Crohn's disease."  AR at 1307.  Shortly thereafter, in May of 2014, Dr. Charles Page diagnosed her with an anal fistula.  AR at 850-51. She underwent surgery to remove the fistula on May 16, 2014, and in a follow-up appointment, Dr. Page reported that she was "healing up well."  AR at 960-76, 982-1019, 848-49.

In April of 2015, Kelly visited Dr. Cline, again exhibiting signs of Crohn's disease. AR at 1121.  Dr. Cline referred her to Dr. Carl Jones, who evaluated Kelly for Crohn's based on her abdominal pain and diarrhea.  AR at 1279.  To address her symptoms, Dr. Jones prescribed medication and scheduled a colonoscopy.  AR at 1279-81. In 2015, Kelly twice returned to Dr. Page, who ruled out a recurring fistula, determining that Kelly had benign anal defects.  AR at 1389.  In 2017, after moving to Connecticut, Kelly was examined at Norwich GI for constipation, bloating, heartburn, and belching following a normal colonoscopy.  AR at 1495-1499. She also reported fistula-related symptoms in a late December 2017 appointment, for which Mr. Dierman referred her back to the GI doctor.  AR at 1529-31.  She continued to experience GI symptoms in 2018, but diagnostic testing revealed no underlying causes.  AR at 1752.

### 3. Behavioral Health Conditions

Kelly has been diagnosed with a number of mental health disorders, including generalized anxiety disorder, depression, and mixed bipolar I disorder.  See AR at 1697, 1666-67.  Records of her behavioral health concerns begin as early as 2009, when Kelly met with Dr. Rick Shatwell in the Nacogdoches Memorial Emergency Room, who noted that "it was clear that she was . . . very depressed and suicidal" and that he planned to "recommend for her to be transferred to a psych facility.  AR at 1383.  Her mental health concerns continued into 2013, when Kelly was prescribed medications to address her anxiety, depression, issues with focus, and insomnia.  AR at 1201, 1225, 1234.

Care providers did not always find that Kelly was exhibiting symptoms. Indeed, during two 2015 appointments, Dr. Cline noted that she was in a euthymic state.  AR at 1137-38.  However, in August 2015, Kelly sought emergency care for chest pain which was diagnosed as an anxiety reaction.  AR at 1345.  She also sought behavioral health care in 2018 and was evaluated for symptoms of generalized anxiety disorder, depression, and a learning disorder.  AR at 1697, 1735-37.  On May 10, 2018, John Brooks, LCSW, diagnosed Kelly with mixed bipolar I disorder.  AR at 1666-72. At a follow-up visit in November 2018, Mr. Brooks added a diagnosis of generalized anxiety disorder, and noted that Kelly was very anxious and had continued symptoms of irritability and insomnia.  AR at 1738-40.

### 4. Daily Activities

Kelly's own reports from a 2015 function report and her testimony before an Administrative Law Judge in her first disability hearing detail her daily activities and capabilities.  On a day-to-day basis, she wrote in her function report, she needed to take

therapeutic showers and keep her feet lifted.  AR at 669.  She also indicated that she cared for her personal hygiene, cooked cleaned, read, and walked the dog for 45 minutes, depending upon how she felt.  AR at 670-71.  While doing chores, she noted, she needed to take a break every half hour to elevate her feet, and she could not work on her feet. AR at 669-70.  In addition, she explained, her hands went numb, and she needed to use the bathroom frequently.  AR at 670.  She reported being able to walk two blocks before needing to rest for fifteen minutes. AR at 674. Several activities, including lifting, climbing stairs, sitting, bending, and standing, caused her trouble because of her back pain. Id.

With regards to her concentration and attention span, she noted that she could pay attention for 30-60 minutes, and that she was "pretty good" at following written instructions but not good at following spoken instructions.  Id.  She said that she was "pretty adjustable" to changes in routine, and handled stress fairly "on a good day." AR at 675.  In her pain report, she noted pain in her feet, hands, and back, and reported that she could stand, walk, or sit for around 4 hours before pain began.  AR at 667.

She also testified before Administrative Law Judge Thomas J. Heglet in Houston, Texas, in July 2016.  AR at 111.  She told him that she drove and shopped, although she limited grocery trips to 20 minutes and was exhausted afterwards.  AR at 129, 132. In February 2017, offering supplemental testimony before the same ALJ, she testified that she cooked and cleaned, but only for 20 minutes before needing to sit down or stretch.  AR at 98.  She also shopped at the grocery store and had no problem putting bags in the car, but limited herself to carrying 5 pounds.  AR at 101.

B.    Procedural History

Kelly filed an application for Social Security Disability benefits and Supplemental Security Income benefits on December 31, 2014 and February 4, 2015, respectively, alleging a disability onset date of May 1, 2014.  AR at 579-585, 586-591.[3]  Her claims were denied initially on August 7, 2015, and again on reconsideration on October 21, 2015.  AR at 226.  Thereafter, she requested and received a hearing and a supplemental hearing before Administrative Law Judge ("ALJ") Thomas J. Heglet, who denied her claims on February 24, 2017.  AR at 223.  Kelly appealed to the Appeals Council, which remanded because the ALJ's Decision did not consider a consultative examiner's report from Ms. Britney Brown Milstead and Dr. Sydney Kroll.  AR at 248-250.  On remand, Kelly testified at a hearing on January 14, 2019, before ALJ John Molleur.  AR at 40-82.  A vocational expert ("VE") also offered testimony.

1.    Kelly's Hearing Testimony

In her 2019 hearing, Kelly testified that, from 2014 through the time of her left hip surgery, she suffered from numbness, tingling, sharp pain, and trouble with mobility.  AR at 48.  After the surgery, she said, her symptoms improved "a little bit", but she continues to have muscle spasms, tingling, and numbness in that hip.  AR at 49.  In addition to her hip pain, she has experienced back pain that radiates down her left leg since 2014, affecting her sitting standing, and walking.  AR at 51.  She testified that her pain limits her in her day-to-day activities, and she has trouble getting out of bed, showering, or clothing herself without help from her husband.  AR at 59-60.  With

---

[3] Because Kelly filed her claims before March 27, 2017, the regulations of sections 404.1527 and 416.927 of title 20 of the Code of Federal Regulations concerning the treating physician rule apply to her claims. See 20 C.F.R. §§ 404.1527, 416.927.

respect to her daily activities, she reported that she occasionally does household chores, "but not repetitively", vacuuming for ten minutes at a time and cooking only microwave meals.  AR at 62-63.  She testified to her ability to walk, explaining first that she could only walk "maybe a block" before she has to sit down, AR at 49, and later that she walked her dog for twenty minutes at a time.  AR at 61.  To reach her second story apartment, she told the ALJ, she climbs a flight of stairs while holding railings on both sides.  AR at 69.

In response to her counsel's questioning, Kelly also testified to tingling and numbness in both of her hands, for which she wears a wrist brace on her left wrist at night.  AR at 53-54.  She noted that the numbness and tingling in her hands limit her to about two minutes of typing and "maybe 20 miles" of driving at a given time.  AR at 55.

She spoke of her GI distress and need for frequent restroom breaks, telling the ALJ that she has suffered from constipation on a regular basis and that she has had issues with diarrhea in the past.  AR at 53.  She reported needing to use the bathroom often, "maybe once within the hour."  Id.

Finally, Kelly testified to her behavioral health issues, recounting racing thoughts, insomnia, and daily mood swings and panic attacks that persist despite therapy and medication.  AR at 56-57, 59.  Responding to her counsel's questions, she explained that she could not stay focused on an at-home project for 30 minutes, she could sometimes watch a TV show for 30 minutes, and she could sometimes watch a movie from start to finish if she took breaks to use the bathroom and readjust in her seat.  AR at 58.

2.      VE Hearing Testimony

After Kelly offered her testimony, the ALJ posed several hypotheticals to the VE

to determine whether an individual in Kelly's condition could perform Kelly's past work

or other jobs.  First, the ALJ asked whether Kelly's prior work or other jobs could be

performed by an individual of Kelly's age, education, and work background, limited to

sedentary work with the following restrictions:

> "[A]void climbing ladders, ropes, or scaffolds.  She can perform other
> postural activities no more than occasionally.  She should avoid work at
> unprotected heights, no exposure to high concentrations or sources of high
> concentrations of vibrations such as power tools; work is restricted to
> simple, routine, repetitive tasks.  She could adhere to a productivity
> standard, but must avoid production type work such as piece work."

AR at 75.  The VE responded that someone with Kelly's limitations would be unable to

do to her prior work as a CNA, a disability worker, or an ER admitting clerk.  Id.

However, the VE continued, such an individual could perform some jobs, including

Surveillance Monitor, Document Preparer, and Charge Account Clerk.  Id.

The ALJ then added two conditions to his initial hypothetical, asking whether any

jobs would be available to a similar individual who also required "ready access to a

restroom" and "no more than brief and incidental contact with the members of the

general public."  AR at 77.  Before the VE could fully respond to the question, the ALJ

changed his hypothetical, asking instead whether any jobs would suit a similar person

who needed a bathroom break approximately once an hour.  AR at 77-78.  In response,

the VE stated that no unskilled work would be available such a person.  AR at 78.The

ALJ then again changed his hypothetical, asking whether some jobs would be available

to a person who required close proximity to a bathroom, but would not need the

bathroom "any more than . . . for scheduled breaks." Id.  The VE indicated that the three jobs he had listed before would meet these conditions.  Id.

The ALJ then added a different condition to his first hypothetical, asking whether such a person could perform any jobs if the person needed to take unscheduled breaks and would be off task for 60 to 90 minutes a day because of chronic pain or other complications.  AR at 78-79.  The VE responded that no other work would be available. AR at 79.  Furthermore, the VE explained, if such a person took more than two unscheduled absences a month or was off-task more than 10-15% of the workday outside of regularly scheduled breaks, that person would not be able to maintain competitive employment.  AR at 80.

Finally, the VE testified that, if the initial hypothetical were further limited to constrain the individual to no more than brief or incidental contact with coworkers and supervisors, then the three jobs would not be available.  AR at 83.

C.    ALJ Decision and Medical Opinion Weighing

Following the hearing and the VE's testimony, the ALJ issued a Decision finding that Kelly was not disabled under the Social Security Act.  AR at 28.  At step one of his analysis, the ALJ found that Kelly had not engaged in substantial gainful activity since her alleged onset date of May 1, 2014.  AR at 18.  At step two, he determined that Kelly suffers from several severe impairments: "degenerative joint disease of the left hip status post left total hip arthroplasty, degenerative disc disease of the lumbar spine, Crohn's disease, gastrointestinal reflux disease (GERD), obesity, mood disorder, bipolar disorder type 1, and generalized anxiety disorder." Id.

At step three, the ALJ determined that Kelly's impairments, singularly or in combination, did not meet the severity of a listed impairment in Appendix 1 to subpart P

of part 404 of title 20 of the Code of Federal Regulations.  Id.  In reaching his decision,

the ALJ relied upon listings 1.02 (dysfunction of a major weight bearing joint due to any

cause), 1.03 (reconstructive surgery . . . of a major weight bearing joint), 1.04 (spinal

disorders), 5.01 (digestive impairments), and 5.06 (inflammatory bowel disease), as well

as listings 12.04 and 12.06 (mental impairments).  He also referred to Social Security

Ruling 02-01, which provides that obesity is a medically determinable impairment.  AR

at 19-20.

At step four, the ALJ found that Kelly had the residual functional capacity ("RFC")

to perform sedentary work with the following limitations:

> "The claimant should avoid climbing ladders, ropes, or scaffolds.  She can
> perform other postural activities no more than occasionally.  The claimant
> should avoid work at unprotected heights and no exposure to higher
> concentrations of vibrations such as power tools.  The claimant's work is
> restricted to simple, routine, repetitive tasks and she can adhere to a
> productivity standard but she must avoid fast-paced, production-type work
> such as piecework.   The claimant can have no more than brief and
> incidental contact with the general public.  The claimant would require
> restroom breaks within the normal break schedule but the bathroom should
> be in close proximity."[4]

AR at 21.  In formulating the RFC, the ALJ explained that Kelly's medically determinable

impairments "could reasonably be expected to cause the alleged symptoms."  AR at 22.

However, he found that her "statements concerning the intensity, persistence, and

limiting effects" of her symptoms were not "entirely consistent with the medical evidence

and other evidence in the record."  Id.  The ALJ noted that he considered evidence

---

[4] It is not apparent to the court whether the VE testified that an individual with these restrictions
would be able to maintain employment. Because the ALJ altered his hypothetical when he questioned the
VE, see, supra, at 11, it is unclear from the hearing transcript whether the VE stated that jobs would be
available to a person with the RFC's limitations of no more than brief or incidental contact with the public
and close proximity to a restroom.

outside the objective medical evidence as well, including three sets of medical opinions:
one from non-treating state agency physicians and psychologists; one from Brittany
Brown Milstead, LPC, overseen by Dr. Sidney Kroll; and one from Allen Dierman, DPN,
FNP-C, Kelly's primary care provider.  AR at 25.

In evaluating these opinions, the ALJ granted less weight to state agency
assessments, limited weight to parts of Ms. Milstead's and Dr. Kroll's opinion, and little
weight to parts of Mr. Dierman's opinion.  Id.  As to Ms. Milstead's opinion, the ALJ gave
limited weight to her findings that Kelly would have "significant impairment in her ability
to sustain concentration, maintain effective social interaction, and deal with normal
pressures in a competitive work setting." Id.  Noting that the opinion is based "primarily
on the claimant's self report", the ALJ found that Ms. Milstead's opinion was internally
contradictory, because the opinion states that Kelly provided "appropriate responses to
questions of proper action in a range of complex social situations", but later opines that
her functional capacity to maintain effective social interaction on a consistent and
independent basis with supervisors, coworkers, and the public "would be significantly
impaired."  AR at 25, 1714.

With regards to Mr. Dierman's opinion, the ALJ determined that medical evidence
showing post-surgery improvement and Kelly's varied daily activities justified awarding
little weight to his findings that Kelly would miss more than four days of work each
month, that she could sit, stand, and walk for 30 minutes at a time, and that she would
be off task for at least 25% of the work day.  AR at 25, 1732.  The ALJ did not specify
whether he attributed any weight to Mr. Dierman's other findings:  that Kelly would need
unscheduled breaks during the workday every 1-2 hours, would be capable of low-

stress work, that her impairments would produce "good days" and "bad days", and that she could rarely twist, stoop, climb stairs, or balance, and never climb ladders, crouch, or kneel.  AR at 1733-34.

As for the 2015 opinions of state physicians and psychiatrists, who found Kelly capable of performing a reduced range of light exertional level work, the ALJ assigned them less weight because "these opinions were based on information contained in the record at the time that the assessments were made." AR at 25. By the time of the ALJ's 2019 Decision, "additional medical evidence received in the course of developing the claimant's case for review . . . ; a different interpretation of the earlier records; and evidence in the form of testimony at the claimant's hearing, consistent with medical evidence in the record, justif[ied] a conclusion that [Kelly]'s impairments [were] more severe", warranting a restriction to sedentary work.  Id.

At step five, the ALJ found that, given Kelly's age, education, work experience, and RFC, she could perform a significant number of jobs in the national economy, including surveillance monitor, document preparer, or charge account clerk.  AR at 27.

### III.    STANDARD OF REVIEW

The ALJ follows a five-step evaluation to determine whether a claimant is disabled within the meaning of the Social Security Act.  At the first step, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the Commissioner proceeds to the second step and considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant has a "severe impairment", the

Commissioner proceeds to step three and asks whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the Regulations.  See 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider that claimant disabled, without considering vocational factors such as age, education, and work experience.  Id.

If the impairment is not "listed" in the Regulations, the Commissioner proceeds to step four and asks whether, despite the claimant's severe impairment, he or she has the RFC to perform past work.  At step five, the Commissioner determines whether there is other work the claimant could perform.  Id.  To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The Commissioner bears the burden of proof on the fifth step, while the claimant has the burden on the first four steps.  See McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014).

The court's review of the Commissioner's Decision "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation omitted); see 42 U.S.C. § 405(g).  "Substantial evidence" requires "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

**IV.     DISCUSSION**

Kelly argues that the ALJ erred by: (1) failing to find Kelly's statements consistent with the record; (2) improperly weighing the record's medical opinions; (3) formulating an RFC unsupported by substantial evidence; (4) failing to consider whether Kelly's condition warranted a finding of a period of closed disability; and (5) improperly relying on the VE's testimony at Step Five.  Pl.'s Mem. of Law at 4, 9, 12, 14, 16 (hereinafter "Pl.'s Mem.").  The court first addresses the ALJ's analysis of the consistency of Kelly's statements, then turns to the weighing of opinions and the substantiality of the evidence supporting the RFC.

A.     Consistency of Kelly's Statements

Kelly argues that the ALJ erred in his analysis of the consistency of Kelly's statements,[5] improperly finding her subjective statements about her symptoms "inconsistent because they are unsupported by the objective medical evidence" and other evidence in the record.  Pl.'s Mem. at 9; AR at 23.  In reaching and justifying his determination that her statements were inconsistent with the record, she contends the ALJ misconstrued several pieces of evidence from the record, failing to fully consider her left-hip symptoms or properly characterize her daily activities.  Pl.'s Mem. at 9-12.[6]

_____

[5] Kelly's memorandum refers to the ALJ's "credibility analysis." See Pl.'s Mem. at 9. However, the ALJ carried out his analysis under Social Security Ruling 16-3p, which came into effect on March 28, 2016, superseding Social Security Ruling 96-7p.  See SSR 16-3p, 2016 WL 1237954; AR at 22.  Under the new Ruling, an ALJ will not use the word "credibility" when assessing the consistency of an applicant's subjective complaints, but will "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  SSR 16-3p. The Regulations underlying 16-3p and 96-7p remains unchanged, see 20 C.F.R. §§ 404.1529, 416.929, so the court considers Kelly's arguments with respect to the consistency of her subjective complaints despite her use of the term "credibility."

[6] Kelly does not challenge the ALJ's assessments of the consistency of Kelly's statements about her abdominal pain, Crohn's disease, or mental impairments.

The Commissioner responds that substantial evidence supports the ALJ's evaluation of the consistency of Kelly's claims.  Def.'s Mem at 10.  The court agrees with Kelly.

To determine a claimant's RFC, an ALJ must "take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted) (per curiam).  The Regulations set forth a two-step process for evaluating a claimant's subjective reports of pain and disabling symptoms.  "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." See id., 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)).  At step two, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' in the record." Id.  (quoting 20 C.F.R. § 404.1529(a)).  Here, the ALJ determined that Kelly suffered from a medically determinable impairment but found Kelly's statements about her symptoms inconsistent with the record's objective medical evidence.  AR at 23.

When an ALJ rejects witness testimony as inconsistent with the record, he must "set forth" the bases for his decision "with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)).  The ALJ must make this determination "in light of medical findings and other evidence[ ] regarding the true extent of the pain alleged by the claimant." Mimms

v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (internal citation and quotation marks omitted).  When an ALJ explains his findings about the consistency of a claimant's statements, they are "generally entitled to deference on appeal." Selian, 708 F.3d at 420 (2d Cir. 2013) (citation omitted).  However, when an ALJ's adverse finding leading to a rejection of a plaintiff's claim is "based on a misreading of the evidence, it [does] not comply with the ALJ's obligation to consider all of the relevant medical and other evidence, and cannot stand." Genier, 606 F.3d at 50 (internal citations and quotation marks removed) (remanding when an ALJ mistakenly interpreted a claimant's statements that he tried to care for his dogs and required assistance for housework to mean that the claimant could care for his dogs and do housework).  Kelly contends that, in analyzing the consistency of her statements with the record, the ALJ misinterpreted objective medical evidence as well as evidence of her daily activities.  The court discusses each in turn.

        1.    Medical Evidence Inconsistencies

Kelly argues that the ALJ took several statements in the medical record out of context when he evaluated the consistency of her statements about her left hip pain.[7] Indeed, in assessing Kelly's post-surgery impairment due to her hip condition, the ALJ erroneously misconstrued three pieces of evidence upon which he relied.  First, he referred to a note in Kelly's records that her "hip pain was reported as resolved in June 2018." AR at 24.  In fact, the note stated that Kelly's left hip osteoarthritis had been resolved on March 28, 2018, the date of her hip replacement surgery, indicating that a

---

[7] The ALJ also made findings as to the consistency of Kelly's statements about her Crohn's disease symptoms, her low back pain, and her mental health.  However, Kelly only challenges the ALJ's findings as to her statements about her left hip pain and her daily activities.

successful surgery had taken place but not that Kelly's pain had dissipated.  AR at 1694.  Second, he noted that Kelly had reported being pain free in a November 2018 appointment, where her provider found her "intact."  AR at 24.  While the treatment notes indeed show that Kelly was not in pain during this November visit, the appointment was for a pap exam, and the record does not suggest that her care provider discussed or examined her hip at that time.  AR at 1743.  Third, the ALJ relied on Kelly's comment to Dr. Stanat during a May 2018 appointment that she enjoyed walking her dog.  AR at 23; 1666.  The visit notes reference her dog walking in a section labeled "avocation" and do not suggest that she was, at the time of the visit, capable of walking her dog.  AR at 1659.  In fact, Dr. Stanat's observations on the same page show that she was having difficulty walking, squatting, lifting, getting into a car, negotiating stairs, getting in and out of bed, standing, and sleeping.  Id.

The ALJ's references to evidence purportedly undermining Kelly's statements about her pre-surgery condition are equally confounding.  The ALJ stated that in December 2014, Kelly had "right hip flexion of 4 out of 5 and 5 out of 5 in the other extremities."  AR at 23.  However, the notes do not show whether the practitioner tested Kelly's flexion in her injured left hip, only that her internal and external hip rotation was a 5 out of 5. AR at 1071.  The ALJ correctly noted that, at the same appointment, she had a grinding feeling in her left hip and that she was prescribed only physical therapy.  AR at 23, 1071-72.  He neglected, however, to discuss her 2015 imaging showing degenerative joint disease in her left hip.  AR at 1258.  Indeed, between her 2014 appointment and Kelly's March 2018 surgery, the ALJ points to only one finding about

Kelly's hip pain: Kelly's pre-operative report that she had no "right-sided hip or knee

pain"—an observation irrelevant to her left-hip condition.  AR at 23, 1542.

Despite the ALJ's misconstruing of the record, the Commissioner argues that the

ALJ's contention that the surgery "was generally successful in relieving the symptoms"

is supported by his other references to the record.  AR at 24; Def.'s Mem. at 11.

However, the ALJ offers only two additional citations to medical evidence about Kelly's

hip.  First, he notes that Kelly was discharged from her home health aide into a physical

therapy program in May 2018.  AR at 24.  Second, he observes that Kelly's physical

therapy notes five weeks after her surgery indicated that she had "good potential for

improved function", AR at 24, 1660, although the same notes also showed difficulty with

mobility, pain with flexion and extension, and swelling.  AR at 1660.  While it is true that,

as the Commissioner contends, "it is the role of the Commissioner, not the reviewing

court, to resolve evidentiary conflicts and to appraise the credibility of witnesses,

including with respect to the severity of a claimant's symptoms." Cichocki v. Astrue, 534

F. App'x 71, 75 (2d Cir. 2013) (summary order), here, no such evidentiary conflict

exists.  Neither Kelly's release from home therapy nor post-operation notes showing a

"good potential for recovery" are inconsistent with Kelly's testimony describing the

extent of her hip pain and lack of mobility.  AR at 1660 (emphasis added).

In addition, the Commissioner argues that Kelly's medical records show further

signs of improvement after surgery, because she reported a limited range of motion and

tenderness but showed normal healing on X-rays and indicated current pain levels of

only 2 to 3 out of 10 at her physical therapy appointments.  AR at 1717-30.  These

findings, however, are no more convincing that the ALJ's own references.  First, the

records to which the Commissioner points do not paint a clear picture of Kelly's condition.  Rather, they show that her pain levels varied, reaching an 8 out of 10 at worst and, in some cases, resting at a 0 out of 10.  Id.  Second, the ALJ has an obligation to explain his findings about a claimant's statements, and "the court is not bound to accept the Commissioner's post hoc reasons that the ALJ did not address." Knepple-Hodyno v. Astrue, No. 11-CV-443 DLI, 2012 WL 3930442, at *10 (E.D.N.Y. Sept. 10, 2012) (citing Snell v. Apfel, 177 F.3d 128, 134 (2d Cir.1999) ("A reviewing court may not accept appellate counsel's post hoc rationalizations for agency action.") (quotation marks omitted)).  Thus, the Commissioner's arguments do not point to substantial evidence upon which the ALJ relied to find Kelly's statements inconsistent with the record.

### 2.    Daily Activity Inconsistencies

Turning from the medical evidence, Kelly also argues that the ALJ mischaracterized statements about her "varied daily activities." An ALJ may not rely on a claimant's daily activities to discredit her while "wholly ignor[ing] the qualifications that Plaintiff placed on [her] ability to engage in [those] activities." Eldridge v. Colvin, No. 15CV3929NSRPED, 2016 WL 11484451, at *15 (S.D.N.Y. June 29, 2016), report and recommendation adopted, No. 15CV3929NSRPED, 2016 WL 6534258 (S.D.N.Y. Nov. 2, 2016) (citation omitted); see also Genier, 606 F.3d at 50. Furthermore, an ALJ should take into account whether any evidence of daily activities shows that the claimant "engage[d] in any of these activities for sustained periods comparable to those required to hold even a sedentary job."  Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting Carroll, 705 F.2d at 643 (claimant's reading, watching television, listening to the radio, and riding public transportation were insufficient to show he was

capable of sedentary work)); Ingrassia v. Colvin, 239 F. Supp. 3d 605, 628 (E.D.N.Y. Mar. 6, 2017) (gathering cases).

The ALJ appears to have disregarded Kelly's qualifying and contextualizing of her daily activities.  First, the ALJ picked statements from intake notes for a 2015 behavioral health appointment, where Kelly told her provider that she and her husband "helped adolescents from the streets and provided them with shelter and food.  They had helped several people." AR at 24, 1698.  The second half of this statement, which the ALJ excluded, clarifies that Kelly and her husband helped several people over the course of their 17-year-long marriage, providing little insight into her physical or mental condition over the relevant period.  AR at 1695.  In a second mischaracterization, the ALJ cited a statement in another of Kelly's behavioral health records indicating that she and her husband helped many people, but here, too, the ALJ neglected to add the second half of the observation: "it is challenging to be in the position of needing people while living in [Connecticut]." AR at 1736.  Third, he relied on notes from Ms. Milstead's July 2015 opinion that Kelly cared for her hygiene, cooked, and did housework, finding them to suggest "that [Kelly] functions at a higher level physically, psychologically, and even cognitively than alleged." AR at 25, 1712.  But here, too, he left out Kelly's qualifications that she "has to spread [housework] out over the whole day to get it all done" and that showering and dressing, "take[ ] her a really long time because of her physical disability."  AR at 1712.[8]

---

[8] The ALJ also again referenced the notes from Dr. Stanat's May 8, 2018 appointment that indicate, in a section labeled "avocation", that Kelly enjoys walking her dog.  AR at 25.  As discussed, see, supra, at 20, this statement is directly above Dr. Stanat's observations that Kelly was having difficulty with her walking and mobility.  AR at 1659.

The Commissioner adds that Kelly's function report showed she was "constantly cleaning" and took the dog for 45-minute walks, although the ALJ does not reference these findings.  Def.'s Mem. at 14.  However, Kelly filed her function report in 2015, over two years before her March 2018 hip surgery and well before her January 2019 testimony in the instant case.  See AR at 669.  As such, it has little bearing on the veracity of Kelly's statements about her pain and mobility at the time of the hearing. See, e.g., Genier, 606 F.3d at 50 (finding that the ALJ misunderstood evidence when he compared a claimant's hearing testimony to statements on the claimant's two-year-old questionnaire).  Kelly's statements outside of the function report, all of which indicate that her daily living activities are constrained by her pain and fatigue, do not support a finding that Kelly engaged in these activities for "sustained period[s] comparable to those required to hold even a sedentary job." See Ingrasia, 239 F. Supp. 3d at 628. Indeed, the record shows that she consistently reported needing to take breaks every 10 to 30 minutes after shopping, AR at 129, 132, walking, AR at 61, or cooking or cleaning, AR at 98, 62.

Upon review, the court finds that the ALJ misconstrued several of the key pieces of evidence on which he based his analysis of Kelly's statements.  In justifying his decision to discredit Kelly's testimony about her left hip limitations, he cited primarily irrelevant or out-of-context medical evidence.  Moreover, he referenced Kelly's "varied daily activities" without taking account of the caveats and limitations she consistently asserted.  Accordingly, the court finds that the ALJ's analysis of the consistency of Kelly's statements with the record was not supported by substantial evidence.

B.    Weighing of Opinion Evidence

Next, Kelly asks this court to remand because the ALJ improperly weighed the medical opinions upon which he relied in reaching his decision.  Pl.'s Mem. at 4. Specifically, Kelly argues that the ALJ erred in granting "limited weight" to the opinion of Consultative Examiner Ms. Milstead and "little weight" to the opinion of Kelly's primary care provider, Mr. Dierman.  Id.  In addition, she asserts that giving "little", "less", or "limited weight" to each medical opinion in the record created an evidentiary gap, warranting remand.  Pl.'s Mem. at 9.  The Commissioner, in response, contends that substantial evidence supports the ALJ's weight assessments.  Def.'s Mem. at 5.

1.    Ms. Milstead's Opinion

Kelly argues that the ALJ erred in giving "limited weight" to Ms. Milstead's finding of Kelly's "significant impairment in her ability to sustain concentration, maintain effective social interaction, and deal with normal pressures in a competitive work setting." AR at 25. To justify his weight assessment, the ALJ cited to internal inconsistencies in the opinion. Id. For instance, while Ms. Milstead opined that Kelly would have difficulty maintaining social interaction, she also found that Kelly offered "appropriate responses" to questions about proper behavior in complex social situations and her history of performing skilled to semi-skilled work.  Id.[9]  In addition, the ALJ

_____

[9] Kelly also argues that the ALJ "does not expressly state what portion of the opinion he gave limited weight to."  Pl.'s Mem. at 6.  However, the ALJ's Decision specifically accords limited weight to Ms. Milstead's findings of "significant impairment in [Kelly's] ability to sustain concentration, maintain effective social interaction, and deal with normal pressures in a competitive work setting." AR at 25.  It is, though, unclear what weight the ALJ assigns to Ms. Milstead's fourth finding that Kelly could "understand, carry out, and remember complex and simple instructions", because the ALJ did not note whether he accorded any weight to this determination.  AR at 1707.

found Ms. Milstead's opinion unreliable because it was based on Kelly's subjective reports of her symptoms.  Id.

With respect to the ALJ's award of "limited weight" to Ms. Milstead's evaluation of Kelly's ability to maintain effective social interaction, the opinion's internal inconsistencies support the ALJ's decision.  When internal inconsistency arises within a medical opinion, the Commissioner "act[s] within his discretion in according the . . . reports little weight." See Gates v. Astrue, 338 F. App'x 46, 49 (2d Cir. 2009) (citing Burgess v. Astrue, 537 F.3d 117, 128 (2008) ("[G]enuine conflicts in the medical evidence are for the Commissioner to resolve.") (internal quotation marks omitted)); see also Calero v. Colvin, No. 16 CIV. 6582 (PAE), 2017 WL 4311034, at *6 (S.D.N.Y. Sept. 26, 2017) ("grounds for an ALJ to give limited weight to a physician's conclusions include: inconsistencies with the rest of the administrative record and internal inconsistencies.").  Here, the ALJ identified inconsistent findings within Ms. Milstead's report, noting that Ms. Milstead found both that Kelly could not maintain effective social interaction and that Kelly "provided appropriate responses to questions of proper behavior in a range of complex social situation[s]." AR at 25.  Therefore, substantial evidence supported the ALJ's decision to give little weight to Ms. Milstead's opinion that Kelly could not maintain effective social interaction.

By the same reasoning, substantial evidence in the record also supports the ALJ's decision to accord limited weight to Ms. Milstead's opinions about Kelly's capacity for concentration and pressure management.  While Kelly points out that Ms. Milstead's report showed that she suffered from anxiety and depression and demonstrated some memory impairment during the evaluation, the report also indicates that Kelly displayed

a thought process that was "mostly logical and goal-directed" along with intact judgment and insight.  AR at 1713-14.  Kelly also answered most mental status questions correctly and told Ms. Milstead that she managed the finances with her husband.  AR at 1712-13.  While the report reveals that Kelly described difficulty staying on task, it also indicates that she focused herself by "put[ting] things in her physical path to accomplish things that need to be done." AR at 1712.  Because the ALJ has "discretion" to accord an opinion little weight on the basis of internal inconsistency, see Gates, 338 F. App'x at 49, this court finds that substantial evidence supported his decision to do so here.[10]

2.     Mr. Dierman's Opinion

Kelly contends that the ALJ should have granted controlling weight to the opinion of her primary care provider, Mr. Dierman, under the treating physician rule.  Pl.'s Mem. at 7.  In response, the Commissioner argues that the treating physician rule does not apply to Mr. Dierman, because he is a nurse practitioner and not a proper medical source under the applicable Regulations.  Def.'s Mem. at 7.  On this issue, this court agrees with the Commissioner.

Generally, "[t]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Burgess, 537 F.3d at 128 (2d Cir. 2008) (internal citation omitted).  However, "the diagnosis of a nurse

---

[10] Kelly also argues that the ALJ's other two reasons for affording Ms. Milsted's opinions little weight are without merit—namely, that the opinion was based on Kelly's self-reported symptoms and that Kelly had "history of performing skilled to semi-skilled work." Pl.'s Mem. at 6-7, AR at 25.  Because the ALJ's decision to afford little weight to Ms. Milstead's opinions is supported by the substantial evidence of the report's internal inconsistencies, the court does not address these arguments.

practitioner should not be given the extra weight accorded to a treating physician."

Mongeur v. Heckler, 722 F.2d 1033, 1032 n. 2 (2d Cir. 1983) (per curiam); see also

Genier v. Astrue, 298 Fed. Appx. at 109-10 (2d Cir. 2008) (finding that the ALJ was free

to discount assessments made by a nurse practitioner in favor of other doctors'

objective findings without causing treating physician error) (unpublished opinion); 20

C.F.R. §§ 404.1502(a), 416.902(a) (excluding nurse practitioners from list of

"acceptable medical source[s]" for claims filed before March 27, 2017).  Because the

treating physician rule does not apply, an ALJ has "discretion to determine the

appropriate weight" to apply to a nurse practitioner's opinion "based on all the evidence

before him." Ruff v. Saul, No. 3:19-CV-01515 (SRU), 2020 WL 6193892, at *8 (D. Conn.

Oct. 22, 2020) (citing Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995)); see also SSR

06-03P, 2006 WL 2329939 at *2 (Aug. 9, 2006) (categorizing nurse practitioners as

"other medical sources") (rescinded as of Mar. 27, 2017).  Mr. Dierman is a licensed

nurse practitioner whose opinion is not owed any extra weight under the treating

physician rule.  Therefore, the ALJ was not required to assign controlling weight to Mr.

Dierman's opinion.

While Mr. Dierman's opinion did not command controlling weight, the opinion of a

nurse practitioner who regularly treats a claimant is "entitled to some extra

consideration." Mongeur, 722 F.2d at 1039 n. 2. Accordingly, this court must find that

substantial evidence supported the ALJ's decision to afford it less weight.  To determine

how much weight to accord to a nurse practitioner's opinion, an ALJ must consider the

same factors he would consider for a treating physician, including: "(1) the frequen[cy],

length, nature, and extent of treatment; (2) the amount of medical evidence supporting

the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Ruff, 2020 WL 6193892 at *8 (citing Selian, 708 F.3d at 418).  While the ALJ need not offer a "recitation of each and every factor," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013), he must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Burgess, 537 F.3d at 129; see also Ruff, 2020 WL 6193892 at *8 (requiring an ALJ to set forth reasons for the weight assigned to the opinion of a treating nurse practitioner).

The ALJ did not meet his obligation to "set forth his reasons" for discounting Mr. Dierman's opinions that Kelly would miss more than four days of work each month, that she could sit, that she would be off task for more than 25% of the work day, or that Kelly could not sit or stand for more than 30 minutes.  See id.; see also AR at 25, 1732-34. To justify his grant of "little weight" to Mr. Dierman's opinions, the ALJ offered a single sentence citing "the medical evidence showing improvements in [Kelly]'s symptoms after her surgery" and her "varied daily activities, including cooking, shopping, and cleaning." AR at 25.

While the ALJ's references to the record's evidence of post-surgery improvement are general, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Durante v. Colvin, 2014 WL 4852881, at *25 (D. Conn. Aug. 7, 2014) (gathering cases), recommended ruling approved and adopted, 2014 WL 4843684 (D. Conn. Sept. 29, 2014).  If the evidence is included in the record and the ALJ makes general reference to it, then it can constitute sufficient evidence.  See, e.g., Ruff, 2020 WL 6193892 at *9.  Indeed, the medical record does contain some evidence showing that Kelly's condition began to improve after her March 28, 2018 surgery; she

reported low current pain scores of 2 to 3 out of 10 at her six physical therapy sessions from June 5 to 26, 2018,[11] and she told providers that her mobility was improving at her last session on June 26 of the same year.  AR at 1717-30.  Eight weeks out from surgery, Dr. Stanat noted that she was doing well and walking with the aid of a walking stick.  AR at 1688.

As Kelly points out, however, the record also contains countervailing evidence suggesting that her recovery may have been more complicated.  See, e.g., Pl.'s Mem. at 8-9.  At her final appointment with Dr. Stanat on May 8, 2019, he observed difficulty with walking, squatting, and other mobility indicators, and established a "long term goal" for a half mile of pain free walking by June 19 of the same year.  AR at 1661.  Notes from her six subsequent June physical therapy sessions, from June 5 to 26, do not indicate whether she met that goal.  AR at 1717-30.  Similarly, the notes from her first physical therapy session on June 5 indicate that she was still having trouble sitting, standing, and walking, but notes from her remaining sessions do not evince her improved ability to do so.  AR at 1717, 1723-30.

Under a reviewing court's lenient standard of review, "where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).  However, in discrediting a nurse practitioner's opinion, an ALJ "is not permitted to cherry pick from the treatment record evidence that is inconsistent with the treating source's opinion in

---

[11] These pain scores indicate Kelly's current level of pain during her physical therapy appointments. Notes from Kelly's June 5 and June 12 appointments also state that her pain was "at worst" an 8 out of 10. AR at 1717, 1725. Notes from the remaining appointments, however, do not report Kelly's "at worst" pain scores. AR at 1723, 1726, 1729, 1730.

order to conclude that such opinion should be accorded less weight nor is he permitted to substitute his own lay opinion for that of a medical source." Collins v. Comm'r of Soc. Sec., No. 18-CV-777SR, 2020 WL 1275453, at *4 (W.D.N.Y. Mar. 17, 2020) (finding that an ALJ erred in discrediting a nurse practitioner's opinion and substituting his own lay opinion when no other medical source opined on the plaintiff's impairment) (citing Quinto v. Berryhill, No. 3:17-cv-24 (JCH), 2017 WL 6017931, at *14 (D. Conn. Dec. 1, 2017) (finding an ALJ improperly "cherry-picked" evidence disfavoring the claimant when the record contained mixed evidence)).  Furthermore, while an ALJ may properly assign less weight to one medical opinion because it conflicts with another, see, e.g., Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 96 (2d Cir. 2010) (citing Burgess, 537 F.3d at 128) (summary order), "[m]edical source opinions that are . . . stale[ ] and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." Camille v. Colvin, 104 F. Supp. 3d 329, 343-44 (W.D.N.Y. May 19, 2015) (quotations and citation omitted), aff'd, 652 F. App'x 25 (2d Cir. 2016).  For an opinion to be stale, "not only must there be a significant period of time between the date of the opinion and the hearing date, there also must be subsequent treatment notes indicat[ing] a claimant's condition has deteriorated over that period." Cepeda v. Comm'r of Soc. Sec., No. 19-CV-4936 (BCM), 2020 WL 6895256, at *10 (S.D.N.Y. Nov. 24, 2020) (internal quotation marks and citation omitted) (gathering cases); see also Martinez v. Saul, No. 3:19-CV-01017-TOF, 2020 WL 6440950, at *8 (D. Conn. Nov. 3, 2020) (finding an opinion stale where subsequently submitted evidence showed changes in the claimant's condition).

Here, the evidence of Kelly's post-surgery recovery is mixed, and the ALJ's brief reference to "medical evidence" showing an improvement after surgery cannot be supported without "cherry-picking" the most positive indicators from treatment records and disregarding the evidence of Kelly's continued mobility limitations.  Furthermore, the only medical or opinion evidence that contradicts Mr. Dierman's opinion that Kelly was unable to stand, walk, or sit for more than 30 minutes at a time appears in the stale 2015 opinions of non-treating state physicians who opined that Kelly could stand, walk, or sit about 6 hours in an 8-hour workday.  AR at 160, 179, 185, 216.  Nearly four years elapsed between the 2015 opinions and the 2019 hearing, during which period Kelly's new treatment records revealed both her hip impairment and her surgery.  What's more, the ALJ himself acknowledged that the state physicians' opinions were outdated, saying:

> "these opinions were based on information contained in the record at the time that the assessments were made . . . . However, additional medical evidence received in the course of developing the claimant's case for review . . . ; a different interpretation of the earlier records; and evidence in the form of testimony at the claimant's hearing, consistent with medical evidence in the record, justifies a conclusion that the claimant's impairments are more severe."

AR at 25.  As the ALJ observes, the state physicians' 2015 opinions, issued without considering any record evidence related to Kelly's hip surgery, her diagnostic hip imaging, or her pre- and post-surgery consultations, are stale and do not constitute substantial evidence to support the ALJ's discrediting of Mr. Dierman's opinion.

Evidence of Kelly's "varied daily activities, including cooking, cleaning, and shopping" after surgery provides an equally unsubstantial ground for disregarding Mr. Dierman's opinion.  AR at 25.  While the ALJ does not cite to a specific part of the

record, evidence of Kelly's post-surgery activities arises primarily in her testimony at her administrative hearing, in which she stated that she occasionally did household chores for ten minutes at a time; shopped with a cart in front of her to keep her steady; microwaved her meals to avoid being on her feet; and could, at most, walk the dog for 20 minutes at a time.  AR at 61-74.  She told the ALJ that she did her laundry, but only with her husband or father carrying the load.  AR at 66.  Her physical therapy notes also indicate that she "overdid it with the laundry" the weekend before her June 18 appointment.  AR at 1726.[12]

Before her surgery, evidence of her varied daily activities is likewise sparing and uninformative as to Kelly's pre- and post-surgery ability to walk, sit, or stand for more than 30 minutes.  While the Commissioner points to Kelly's 2015 Function Report indicating that she was "constantly cleaning" and took the dog for 45-minute walks, this report was filed in 2015, long before Kelly's surgery, and cannot account for subsequent changes to Kelly's mobility.  See, e.g., Riccobono v. Saul, 796 F. App'x 49, 50 (2d Cir. 2020) (suggesting that the ALJ erred in relying on a plaintiff's past ability to exercise when that ability ended sometime during the alleged disability period).  The court notes that Kelly's 2016 and 2017 testimony before a Texas ALJ also suggests that Kelly shopped, cooked, and cleaned at times before surgery.  AR at 129-32, 98.  However,

---

[12] As discussed in more detail at pages 22-24, supra, the ALJ's Decision frequently mischaracterizes the Kelly's daily activities, "wholly ignor[ing] the qualifications that Plaintiff placed on [her] ability to engage in [those] activities."  Eldridge v. Colvin, No. 15CV3929NSRPED, 2016 WL 11484451, at *15 (S.D.N.Y. June 29, 2016), report and recommendation adopted, No. 15CV3929NSRPED, 2016 WL 6534258 (S.D.N.Y. Nov. 2, 2016) (citing Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 351-52 (E.D.N.Y. 2010)).

her testimony makes clear that, even before her hip replacement, she was unable to do so without limiting her activity to 20 minutes and taking frequent breaks.  Id.

Accordingly, neither the objective medical evidence nor Kelly's daily activities constitute substantial evidence supporting the ALJ's decision to accord little weight to Mr. Dierman's opinion.  Given Mr. Dierman's year-long treatment relationship with Kelly and the lack of objective medical or other evidence justifying the ALJ's discounting of his opinion, this court finds that substantial evidence does not support the ALJ's decision to accord little weight to Mr. Dierman's opinion.

3.      Limited Weight for All Opinions

Finally, Kelly argues that the ALJ erred in giving less, little, or limited weight to parts of each of the medical opinions in the record, creating an evidentiary gap that warrants remand.  Pl.'s Mem. at 9.  The ALJ awarded less weight to some opinions of non-examining state agency physicians, less weight to portions of Ms. Milstead's opinion, and little weight to parts of Mr. Dierman's opinion.  AR at 25.  The Commissioner contends that, in formulating the RFC, the ALJ relied on sufficient evidence was "not required to rely on any one opinion." Def.'s Mem. at 9.

A threshold question in a social security benefits case is whether the ALJ fulfilled his obligation to adequately develop the record.  See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).  Courts in this Circuit have found that an ALJ fails to fully develop the record and creates "an evidentiary gap that warrants remand" if he "gives only little weight to all the medical opinions of the record." Waldock v. Saul, No. 18CV06597 (MJP), 2020 WL 1080412, at *3 (W.D.N.Y. Mar. 6, 2020) (citations omitted) (emphasis added); see also Kurlan v. Berryhill, No. 3:18-CV-00062 (MPS), 2019 WL 978817, at *1 (D. Conn. Feb. 28, 2019) ("It is well established that an ALJ who makes an RFC

34

determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error.") (citing Staggers v. Colvin, 2015 WL 4751123, at *2 (D. Conn. Aug. 11, 2015)) (internal quotation marks and citations omitted).

Here, the ALJ gave less weight, little weight, or limited weight to portions of each medical opinion in the record.[13] The ALJ did reference findings, albeit not opinions, assessing Kelly's functional capacity, from Ms. Milstead's report, which addressed only Kelly's mental and behavioral symptoms.  AR at 24-25.  With respect to Kelly's physical symptoms, however, it is unclear whether the ALJ relied on any medical opinion to reach his RFC determination.  AR at 25.  Only two sets of medical opinions addressed Kelly's physical limitations: the 2018 opinion of Mr. Dierman and the aged 2015 opinions of the state physicians.  The ALJ did not cite to any of these opinions to support his RFC finding, except to reference a state physician's shorthand notes copying medical evidence from the larger record.  AR at 23; AR at 216.[14]  As this court has already noted, the state physicians' 2015 opinions were stale at the time of the hearing and could not properly support the ALJ's RFC determination.  See, supra, at 30-32. The ALJ

---

[13] As detailed on pages 14-15, supra, the ALJ gave little weight to Mr. Dierman's opinions that Kelly would miss more than four days of work per month, that she could sit, stand, and walk for 30 minutes at a time, and that she would be "off task" for 25 percent or more of the work day.  AR at 25.  He gave limited weight to Ms. Milstead's opinions that Kelly demonstrated "significant impairment in her ability to sustain concentration, maintain effective social interaction, and deal with normal pressures in a competitive work setting."  AR at 25.  He gave less weight to the assessments of State agency physicians and psychologists who found that Kelly could perform a reduced range of light exertional level work. AR at 25.  He did not specify whether he gave weight to Mr. Dierman and Ms. Milstead's other findings—namely, that Kelly could "understand, carry out, and remember complex and simple instructions" or that she would need unscheduled breaks during the workday every 1-2 hours, would be capable of low-stress work, that her impairments would produce "good days" and "bad days", and that she could rarely twist, stoop, climb stairs, or balance, and never climb ladders, crouch, or kneel.  AR at 1714, 1732-34.

[14] The ALJ refers to these notes as "objective medical evidence", and they point to treatment records from Kelly's December 2014 MRI.

also forwent the opportunity to seek a medical opinion from Kelly's treating surgeon, Dr. Stanat.  Thus, only Mr. Dierman's opinion offered a current, updated assessment of Kelly's physical functional capacity for sedentary work.

Although Mr. Dierman's opinion was the sole, up-to-date medical opinion in the record, it is clear that Mr. Dierman's evaluation does not support the ALJ's RFC finding. First, Mr. Dierman found that Kelly would miss more than four days of work per month and spend more than 25% of her time off-task due to her condition.  According to the testimony of the VE at Kelly's hearing, a person with these limitations and Kelly's other constraints could not maintain competitive employment.  See AR at 79-80.  Second, Mr. Dierman found that Kelly could sit, stand, or walk for just 30 minutes at a time— limitations that might well preclude her from performing sedentary work.  See, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005) (finding that a doctor's assessment that a claimant could lift and carry only between five and ten pounds, could stand and/or walk for up to thirty minutes, and could sit up to forty-five minutes might prevent him from carrying out sedentary work); see also 20 C.F.R. §§ 404.1567(a), 416.967(a) (explaining that, for sedentary work, "a certain amount of walking and standing is often necessary in carrying out job duties"). Consequently, because Mr. Dierman's opinion was the only updated medical opinion in the record, and the ALJ failed to properly weigh it, the ALJ relied on no medical opinion in deciding that Kelly would not miss more than four days of work per month, be off task for 25 percent of the day, or be incapable of sitting, standing, or walking for more than 30 minutes at a time. Thus, no current medical opinion supported the ALJ's RFC determination that Kelly was capable of sedentary work.

a.   <u>Substantial Evidence Outside of Medical Opinions</u>

Although the ALJ's RFC determination is inconsistent with the only updated medical opinion in the record, the Second Circuit has held, in several cases cited by the Commissioner, that remand for failure to rely on a medical source statement is not always necessary where the record contains sufficient evidence from which the ALJ can determine the RFC.  Def.'s Memo at 9.  Indeed, an ALJ's decision need not "perfectly correspond with any of the medical sources cited in his decision", and he is "entitled to weigh all of the evidence available to make an RFC finding . . . consistent with the record as a whole." <u>Matta v. Astrue</u>, 508 F. App'x 53, 56(2d Cir. 2013) (summary order); Def.'s Memo at 9.  Accordingly, when an ALJ evaluates the record's medical opinions, it is "within [his] province . . . to accept parts of a doctor's opinion and to reject others." <u>Wilburn v. Colvin</u>, No. 115CV00058DNHTWD, 2016 WL 1237789, at *6 (N.D.N.Y. Feb. 29, 2016), <u>report and recommendation adopted sub nom. Wilburn v. Comm'r of Soc. Sec.</u>, No. 1:15-CV-58, 2016 WL 1238238 (N.D.N.Y. Mar. 28, 2016) (citing <u>Veino v. Barnhart</u>, 312 F.3d 578, 588–89 (2d Cir. 2002)).  In conducting his analysis, the ALJ is under "no obligation" to seek further information "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history . . . ." <u>See Rosa</u>, 168 F.3d at 79 n.5 (2d Cir. 1999) (internal quotation marks omitted); <u>see also Monroe v. Comm'r of Soc. Sec.</u>, 676 F. App'x 5, 9 (2d Cir. 2017).  However, "courts have upheld an ALJ's RFC finding only where the record is clear and, typically, where there is <u>some</u> useful assessment of the claimant's limitations from a medical source." <u>Kurlan</u>, 2019 WL 978817, at *2 (citing <u>Staggers</u>, 2015 WL 4751123) (emphasis in original). Each of the cases that the Commissioner cites is distinguishable from the instant case.

37

In Monroe, the court found that the ALJ's RFC determination was supported by sufficient evidence when the ALJ rejected a doctor's opinions but relied on his treatment notes which "provide[d] contemporaneous medical assessments of [the plaintiff]'s mood, energy, affect, and other characteristics relevant to her ability to perform sustained gainful activity." Monroe, 676 F. App'x at 8 (2d Cir. 2017).  The notes also related to social activities relevant to her functional capacity, like snowmobile trips, horseback riding, and going on cruise vacations.  Id.  Here, notes and evidence in the record do not provide "contemporaneous medical assessments" supporting Kelly's ability to sit or stand for more than thirty minutes.  See id.  Likewise, in Perez v. Chater, cited in Rosa,[15] the court found the ALJ's duty to develop the record was satisfied when a report from the plaintiff's treating physician indicated that the plaintiff "was capable of performing both sedentary work and her past relevant work." 77 F.3d 41, 48 (2d Cir. 1996).  Here, no such report, other than the state physicians' stale 2015 reports based on a limited and aged record, exists.  Similarly, the court in Matta issued a summary order finding that the ALJ's decision need not "perfectly correspond" with any of the medical source opinions in the record when the ALJ "explained in his opinion" that the RFC assessment took account of the opinions of all of the experts as well as the notes of other treatment providers.  508 F. App'x at 56.  Here, the ALJ accorded little, less, or

_____

[15] In Rosa, also referenced by the Commissioner, the court found in a case with a sparse record and non-English speaking claimant represented by a legal assistant that "numerous gaps in the administrative record should have prompted the ALJ to pursue additional information regarding [the plaintiff]'s medical history."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).  Here, by contrast, the record is voluminous, but nonetheless lacks evidence contradicting Mr. Dierman's opinions.

limited weight to each of the experts' opinions and reached an RFC that runs counter to the only up-to-date medical opinion in the record.[16]

Unlike the cases cited by the Commissioner, Kelly's mixed record provides no clear metric for her functional capacity to walk, sit, or stand for more than 30 minutes, or of the likelihood that she will be off-task or absent from work.  See, supra, at 28-33 (discussion of hip-related evidence).  In addition to the hip-related evidence that the court has discussed so far, the ALJ also asserted that "diagnostic imaging supports the residual functional capacity herein", proposing that Kelly's 2014 MRI showing mild to moderate degenerative disc disease "supports the limitation to the reduced range of sedentary work herein." AR at 24. The 2014 scan was taken before imaging in 2015 showed additional hip and back impairments, AR at 1258, and before most of Kelly's hip-related issues emerged.  It is unclear to the court how this scan showing degenerative disc disease supports a finding that Kelly is capable of sedentary work, especially in light of the remainder of the record.  The ALJ's reliance on this aged scan unrelated to Kelly's hip impairment suggests "cherry-picking."  See, e.g., Quinto, 2017 WL 6017931, at *14.  Moreover, in depending on this imaging, the ALJ improperly "substitute[d] his own lay opinion for competent medical opinion", Staggers, 2015 WL 4751108, at *3, interpreting the raw results of a years-old scan to reach a conclusion

---

[16] The Commissioner also cites Bliss v. Commissioner of Social Security for its holding that "the ALJ need not involve medical sources or claimant's counsel in his deliberative process or assessment of the evidence."  Bliss v. Comm'r of Soc. Sec., 406 F. App'x 541, 542 (2d Cir. 2011) (summary order).  Def.'s Mem. at 10.  This holding is largely inapplicable to the instant case, because Kelly does not assert that the ALJ should have alerted her or her medical providers to any inconsistencies in their opinions.

contrary to that of the only relevant medical opinion in the record.  Therefore, the court cannot find that sufficient evidence supported the ALJ's RFC determination.

Because he gave little, less, or limited weight to all of the opinions in the record, the ALJ failed to meet his "duty to develop the record and obtain relevant medical opinions before making an RFC determination." See Kurlan, 2019 WL 978817 at *3.  No updated medical opinion informed his finding that Kelly could perform sedentary work.  Furthermore, unlike the records in the cases the Commissioner cites, here, the record does not otherwise provide substantial evidence supporting the ALJ's RFC determination.  Accordingly, the ALJ's failure to assess meaningful weight to any medical opinion in the record created an "evidentiary gap" requiring remand.  See Waldock, 2020 WL 1080412, at *3.

C.    Failure to Consider a Closed Period of Disability

Kelly also contends that the ALJ erred in failing to consider whether she was eligible for a closed period of disability for her left hip condition for a limited period of greater than 12 months following the onset of her disability on May 1, 2014.  Pl.'s Mem. at 14-15.  The Commissioner argues that, in deciding Kelly's RFC, the ALJ met his obligation to consider evidence from the entire relevant period.  Def.'s Mem. at 18.

When an ALJ decides whether a claimant is entitled to disability benefits, he should determine whether, notwithstanding any improvements during the relevant period, the claimant "may have been disabled for a closed period of one year or more." See Robinson v. Saul, No. 3:18-CV-01605 (KAD), 2020 WL 652515, at *8 (D. Conn. Feb. 11, 2020); see also Smith v. Berryhill, No. 17-CV-05639 (PAE) (SN), 2018 WL 4565144, at *4 (S.D.N.Y. Sept. 24, 2018) (adopting Report and Recommendation) ("direct[ing] the ALJ on remand to consider expressly whether, notwithstanding certain

evidence tending to suggest improvement in her condition, [the plaintiff] was disabled for any period of time greater than 12 months following the onset of her disability" where it was unclear from the record whether "the ALJ considered a closed period of disability at all").  A claimant "has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework established in the SSA regulations."  Smith v. Colvin, No. 3:14-CV-1752(WIG), 2016 WL 11372344, at *3 (D. Conn. Jan. 4, 2016), report and recommendation adopted, No. 3:14-CV-1752 (SRU), 2016 WL 1170910 (D. Conn. Mar. 23, 2016) (quoting Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013)).

Here, the ALJ did not expressly consider whether Kelly was disabled for a closed period of time.  It is true that, as the Commissioner argues, this court has declined to direct an ALJ to consider a closed period of benefits when a plaintiff offered a "perfunctory argument without more."  See Smith v. Colvin, 2016 WL 11372344, at *3. However, here, Kelly has pointed to evidence of her disability in the period leading up to her surgery that the ALJ left unacknowledged, including 2015 and 2017 hip X-rays showing degenerative joint disease in the left hip join space and bone-on-bone degeneration.  See Pl.'s Mem. at 14.  It is unclear if the ALJ considered whether, as a result of her hip or other conditions, Kelly was disabled during any period of twelve months or more during the relevant period.  Because the court finds sufficient grounds for remand on Kelly's other claims, the court will not determine whether Kelly was disabled for any such period.  See, e.g., Smith, 2018 WL 4565144, at *4 (declining to direct a finding of disability but directing the ALJ to consider a closed period of

disability). However, on remand, the court directs the ALJ to determine whether Kelly was entitled to benefits for any closed, continuous period of 12 months.

D.    Error at Step 5

Lastly, Kelly argues that, because the ALJ failed to properly determine the RFC at step 3, his conclusions at step 5 are not supported by substantial evidence. "An ALJ may rely on a VE's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption[s] upon which the VE based his opinions, and the hypothetical accurately reflects the limitations and capabilities of the claimant involved." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). Given that the ALJ's RFC was not supported by substantial evidence, this court cannot conclude that his hypothetical accurately reflected Kelly's limitations and capabilities. Indeed, when the ALJ posed a hypothetical to the VE incorporating Mr. Dierman's findings that Kelly would miss more than four days of work a month and would be off task for more than 25 percent of the workday, the VE responded that no jobs would be available to a person with Kelly's characteristics. AR at 78-8087. Thus, the ALJ's conclusions at step 5, which he drew based on the RFC hypothetical excluding some of Kelly's possible physical limitations, are not supported by substantial evidence.[17]

V.    CONCLUSION

Substantial evidence supported neither the ALJ's finding that Kelly's statements were inconsistent nor his decision to accord Mr. Dierman's opinion little weight.

---

[17] Because the court finds Kelly's other claims sufficient to warrant remand, the court does not consider her claims that the ALJ failed to account for discrepancies between the VE's testimony and the Dictionary of Occupational Titles. Pl.'s Mem. at 17.

42

Furthermore, no up-to-date medical opinion or other substantial evidence supported his RFC determination that Kelly was capable of sedentary work.  Because his RFC findings were not grounded in substantial evidence, his step 5 conclusions were likewise unsupported by substantial evidence.  As such, the court vacates the ALJ's Decision and remands for further proceedings. The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

      Dated at New Haven, Connecticut this 17th day of September 2021.


/s/  Janet C. Hall
Janet C. Hall
United States District Judge